IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| PATRICIA TOMASELLO,<br>    Plaintiff, | ) )<br>) | |
| v. | ) ) | Case No. 1:15-cv-95 |
| FAIRFAX COUNTY, VIRGINIA,<br>    Defendant. | ) )<br>)<br>) | |

## MEMORANDUM OPINION

Plaintiff in this five-count employment discrimination and retaliation case has been an employee of defendant for nearly twenty years, serving in the Fairfax County Fire and Rescue Department since August 1996. Plaintiff alleges that dating back to when she first began her employment with defendant in 1996, she has been subjected to discriminatory treatment on the basis of her race and sex. More recently, in February 2010 plaintiff was diagnosed with cancer, which plaintiff alleges prompted a new wave of discrimination on the basis of her disability in addition to the already allegedly prevalent racial and gender discrimination. Accordingly, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 29, 2014, and thereafter (presumably after obtaining a right to sue letter) filed this action on January 26, 2015, alleging (i) discrimination in violation of Title VII[1] on the basis of race and sex (Count I), (ii) retaliation in violation of Title VII (Count II), (iii) violation of the First and Fourteenth Amendments (Count III), (iv) discrimination in violation of the

---

[1] 42 U.S.C. § 2000e *et seq.*

Americans with Disabilities Act ("ADA")[2] (Count IV), and retaliation in violation of the ADA (Count V).

Defendant Fairfax County filed a motion for summary judgment on all counts, which was thereafter fully briefed, argued, and taken under advisement. For the reasons that follow, the undisputed record facts disclose that defendant is entitled to judgment as a matter of law.

## I.

The undisputed facts central to this dispute may be succinctly stated.[3] Plaintiff is an African-American female with a history of cancer who has been employed with the Fairfax County Fire and Rescue Department ("the Department") since August 1996. The Department is an agency of the named defendant, Fairfax County, Virginia.

In September 2005, plaintiff was promoted to Lieutenant in the Fire and Hazardous Materials Investigative Services Section ("FHMIS") in the Department's Fire Prevention Division, a sworn law enforcement position. Upon completion of the required academy training,

--------

[2] 42 U.S.C. § 12101 *et seq.*

[3] The facts recited here are derived from defendant's statement of undisputed facts, submitted as required by Local Rule 56(B), as well the summary judgment record, including depositions, documents, and declarations. It is important to note that both Local Rule 56(B) and the Rule 16(b) Scheduling Order (Doc. 21), ¶ 2(e), require that a brief in response to a motion for summary judgment must include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. Here, although plaintiff disputes certain of defendant's enumerated undisputed facts, plaintiff frequently does so without citation to the summary judgment record or to any admissible evidence. Where this occurs, defendant's asserted fact is appropriately deemed admitted. *See* Local Rule 56(B) ("[T]he Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); Doc. 21 (similar). Nonetheless, the analysis that follows recognizes that plaintiff claims that certain facts are disputed, but the analysis then proceeds to demonstrate that the putative disputed fact is either immaterial or unsupported (or, in some instances, contradicted) by the summary judgment record.

plaintiff was sworn in as a law enforcement officer and officially became a Fire Investigator. In

this position, plaintiff's job duties included (i) conducting investigations to determine the origins

of fires, explosions, and hazardous materials cases, (ii) responding to hazardous material

incidents, (iii) interviewing witnesses and examining incident scenes for evidence, (iv) preparing

cases for prosecution, and (v) testifying in court.

In February 2010, plaintiff was diagnosed with cancer. Thereafter, in August 2010,

plaintiff requested to be placed on light duty, and this request was granted.  Plaintiff concedes

she requested light duty because, as a result of her chemotherapy, she could not dig through

debris to determine the origins of a fire or enter hazardous environments, both of which are listed

in defendant's description of the "essential duties" of a Fire Investigator. *See* Def't Mem. Supp.

(Doc. 35), Ex. 4. During her light duty, plaintiff temporarily swapped positions with a lieutenant

in a technical support position, which did not require performance of duties inconsistent with her

medical condition. In July 2011, plaintiff requested an extension of time on light duty beyond the

one calendar year that Department policy allowed. This request was also granted. Then, in

November 2011, Chief Barrero, plaintiff's supervisor, informed plaintiff that it was necessary to

transfer plaintiff out of FHMIS, but in fact no transfer followed. Instead, plaintiff remained on

light duty in FHMIS until December 2011, when she was medically cleared to return to regular

shift duty as a Fire Investigator. She then resumed her former position.

In February 2012, plaintiff's cancer recurred, and plaintiff thereafter again requested light

duty in April 2012, which Chief Barrero approved.[4] Thus, plaintiff received a light duty work

assignment within FHMIS, but was informed that no light duty assignments were permanent and

---

[4] Although plaintiff disputes that Chief Barrero approved the request, plaintiff's record citation
serving as the basis for this dispute is plaintiff's own deposition testimony in which plaintiff
affirmatively states that Chief Barrero approved the request. Tomasello Dep., 184:20-185:1.

that this assignment was subject to change at any time based on Department needs. Plaintiff once again switched positions with another employee such that plaintiff assumed a technical support position within FHMIS that did not require performance of duties inconsistent with her medical condition.

In August 2012, plaintiff submitted to the Department her first and only written complaint alleging discourteous and discriminatory treatment by Chief Barrero. Plaintiff concedes that defendant's response to this complaint resolved her issues with Chief Barrero and that there were no subsequent incidents of discourteous or discriminatory treatment by Chief Barrero at FHMIS. Def't Mem. Supp. at 6-7, ¶ 26; P. Opp. (Doc. 41) at 18, ¶ 16 (not denying the relevant portion of defendant's stated fact). In September 2013, plaintiff was medically cleared to return to regular duty and she then returned to shift work as a Fire Investigator.

Thereafter, in October 2013, defendant received a complaint from a rental property manager regarding employment verification information the property manager had received— ostensibly from human resources official Katrina Powell—regarding plaintiff's son, Armando, who had been employed with the Department from May 2013 until his termination in July 2013. When the property manager initially sought to verify Armando's employment with the Department, the property manager received, via fax, a signed employment verification form that listed a return telephone number, which the property manager then called to confirm the fax's authenticity. Over the telephone, the property manager spoke with a woman claiming to be Katrina Powell, the name matching the signature on the verification form. After observing that Armando never seemed to go to work, the property manager decided to double check his employment status. When the property manager again called the telephone number listed on the employment verification form, her call went to a voicemail system identifying the telephone

4

number as plaintiff's rather than Powell's. From this, the property manager concluded that she

had been deceived and lodged a complaint with defendant's human resources department.

The matter was referred to Guy Morgan, the Department's Professional Standards

Investigator, who then investigated plaintiff for a series of unprofessional and unlawful acts

while on duty as a sworn law enforcement officer, including:

(1) providing false verbal and written employment information about Armando;

(2) impersonating Powell;

(3) forging Powell's signature on a public document; and

(4) using Department equipment to communicate false employment information
in order to assist Armando in obtaining a lease.

Over the course of the investigation, plaintiff admitted that she made false statements about

Armando's employment, at one point telling Morgan, "I'm telling you, I lied. I did lie. I lied."[5]

In fact, Morgan's interview of plaintiff was recorded, and a complete review of the video

recording of plaintiff's interview discloses several instances in which plaintiff admitted to

dishonesty with respect to her verification of Armando's employment. *E.g.*, Def't Mem. Supp.,

Ex. 17 at 38:17 ("It was not true."); 1:25:30 ("I didn't tell the truth initially about my son. I

didn't tell the truth."); 1:33:36 ("It is a lie, but I wasn't looking at it as a lie."). Based on his

investigation, Morgan concluded that plaintiff violated at least six Department policies, including

those touching on truthfulness.[6] Accordingly, in December 2013, one of plaintiff's supervisors,

---

[5] Def't Mem. Supp., Ex. 16 at ¶ 13 (Guy Morgan's affidavit recording his recollection of events); *id.*, Ex. 17 at 1:29:09 (video recording of Morgan's interview with plaintiff that is consistent with Morgan's affidavit). These statements by plaintiff to Morgan are admissible as admissions under Rule 801(d)(2), Fed. R. Evid.

[6] Specifically, Morgan concluded that plaintiff violated Department Rules and Regulations 100.03 (obedience to the law), 100.05 (human relations), 200.07 (immoral conduct), 200.18

Chief Reilly, proposed terminating plaintiff's employment. Plaintiff appealed this recommendation, and the Department, acting through Fire Chief Bowers, ultimately decided in January 2014 to reduce the disciplinary action from termination to a ten-day suspension without pay.

In addition to being suspended without pay, plaintiff lost her position as a Fire Investigator and was transferred to the Operations Bureau to serve there as a lieutenant, the same rank she held prior to this reassignment. The undisputed record further reflects that defendant concluded that the transfer was necessary because Fire Investigators, as part of their duties, must be able to present reliable testimony in criminal trials. Plaintiff, as a result of a finding of a truthfulness violation, would not be able to offer such testimony without being subject to an attack on her credibility. Indeed, defendant considered plaintiff to pose a *Brady*[7] problem, *i.e.*, criminal defendants would be entitled to know about plaintiff's untruthful behavior and to use this fact for impeachment purposes were plaintiff to testify at a trial. Specifically, under the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150, 154 (1972), a witness's reliability falls within the scope of required *Brady* disclosures when the witness's reliability may

---

(truthfulness), and 200.19 (unbecoming conduct). Morgan also concluded that plaintiff violated Standard Operating Procedure 01.03.03, relating to internal investigations, and committed felony forgery under Virginia law. Def't Mem. Supp., Ex. 16 at ¶ 14. Notably, Morgan's conclusion as to forgery is a legal conclusion that might not be admissible at trial, but even assuming that Morgan is not competent to testify at trial that plaintiff committed felony forgery, Morgan's other conclusions about plaintiff's misconduct are fully admissible and create an independent and sufficient basis on which defendant could discipline plaintiff. Although plaintiff argues that the allegations against her are false and objects that defendant's evidence on this matter consists entirely of hearsay, Morgan's affidavit explaining his investigation and his conclusions is admissible summary judgment evidence because Morgan has firsthand knowledge of the nature of his investigation and his conclusions. *See* Rule 602, Fed. R. Evid.

[7] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or to punishment, irrespective of the good faith or bad faith of the prosecution).

be material to guilt or punishment. Given this, the Department concluded that plaintiff could not provide reliable testimony in trials and therefore could not perform an essential function of her job as a Fire Investigator.

After her reassignment to the Operations Bureau, plaintiff, as part of her job duties, was required to perform fire suppression, which she had not performed since her promotion to Fire Investigator in 2005. Accordingly, prior to performing work in the field, plaintiff was required, consistent with standard operating procedures, to complete a Field Reentry Program. In January 2014, while participating in the Field Reentry Program, plaintiff filed her EEOC charge of discrimination.

In February 2014, plaintiff entered the second phase of the Field Reentry Program, which required plaintiff to begin working 24-hour shifts. Prior to completing this phase of the program, in June 2014 plaintiff requested a change in her work schedule so that she could work day shifts rather than 24-hour shifts. Plaintiff also submitted an ADA Accommodation Request Form in June 2014 requesting "day work." The Department granted plaintiff's request and assigned plaintiff to perform a temporary day work assignment in Headquarters beginning in June 2014. A little over a year later, in August 2015, the Department classified plaintiff as medically disqualified from performing the essential job tasks of a firefighter based on a recommendation from Dr. Donald Stewart, M.D. Since October 2015, plaintiff has been on leave under the Family Medical Leave Act.[8]

---

[8] This fact does not appear in the summary judgment record, but was adduced in the course of oral argument. *See* Transcript of Motions Hearing ("Tr.") at 19:22-24 (Nov. 6, 2015).

## II.

Plaintiff alleges a number discriminatory actions reaching back nearly twenty years to the commencement of her employment with defendant in 1996. Specifically, the Amended Complaint alleges five counts:

(1) Count I: Discrimination on the basis of race and sex in violation of Title VII based on

(i) defendant's transfer of plaintiff from FHMIS to the Operations Bureau;

(ii) denial of equal employment opportunities in training, promotion, and benefits;

(iii) creation of a hostile work environment; and

(iv) disparate treatment.

(2) Count II: Retaliation in violation of Title VII based on

(i) defendant's transfer of plaintiff from FHMIS to the Operations Bureau;

(ii) denial of equal employment opportunities in training, promotion, and benefits;

(iii) creation of a hostile work environment; and

(iv) disparate treatment.

(3) Count III: Violation of the First and Fourteenth Amendments based on

(i) defendant's custom and policy of discrimination; and

(ii) defendant's failure to train employees with respect to plaintiff's rights.

(4) Count IV: Discrimination in violation of the ADA based on

(i) defendant's failure to accommodate plaintiff;

(ii) defendant's transfer of plaintiff from FHMIS to the Operations Bureau;

(iii) denial of equal employment opportunities in training, promotion, and benefits;

(iv) creation of a hostile work environment;

(v) making unlawful inquiries into plaintiff's medical history; and

(vi) disparate treatment.

(5) Count V: Retaliation in violation of the ADA based on

(i) defendant's transfer of plaintiff from FHMIS to the Operations Bureau;

(ii) denial of equal employment opportunities in training, promotion, and benefits;

(iii) creation of a hostile work environment; and

(iv) disparate treatment.

Common to Counts I, II, IV, and V are claims that defendant violated the law by (i) transferring plaintiff to a new position, (ii) denying equal employment opportunities with respect to training, promotion, and compensation, (iii) creating a hostile work environment, and (iv) engaging in "disparate treatment." In addition, Count IV claims further violations of the ADA through defendant's (i) failure to accommodate plaintiff's disability and (ii) making unlawful inquiries into plaintiff's medical history. Yet, not all of these claims are properly presented here. Two important doctrines—exhaustion of administrative remedies and the statute of limitations— operate to bar certain of plaintiff's claims. Thus, analysis properly begins by identifying which of plaintiff's claims are ripe for adjudication and which of her claims are barred by a failure to exhaust administrative remedies or by the statute of limitations.

## A.

Both Title VII and the ADA require a plaintiff to exhaust administrative remedies before pursuing litigation in federal court. *See Syndor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012) ("[T]he ADA incorporates [Title VII]'s…requirement that a plaintiff must exhaust his administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court."). Nor is this a mere formality; exhaustion is an integral part of the enforcement scheme for these statutes. Specifically, by channeling allegations of discrimination through the EEOC in

9

the first instance, the exhaustion doctrine operates to provide employers with notice of the alleged violations and to allow the EEOC to use administrative conciliation to address and, where appropriate, to remedy any violations more quickly and inexpensively than may be typically accomplished through litigation. *See id.* Given the important role of the administrative process, courts have understandably and uniformly determined that the scope of a plaintiff's right to sue is limited by the contents of the charge of discrimination filed with the EEOC. *See id.* (citing *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009)). Thus, the touchstone of the administrative exhaustion analysis is whether the allegations in the complaint are reasonably related to the EEOC charge such that the claims in the complaint "can be expected to follow from a reasonable administrative investigation." *Smith v. First Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). In other words, a claim in a complaint that is not explicitly disclosed in an EEOC charge is nonetheless administratively exhausted if a reasonable administrative investigation would have disclosed the alleged conduct. By contrast, where the factual allegations in the formal lawsuit "reference different time frames, actors, and discriminatory conduct" when compared with the EEOC charge, the claims have not been exhausted. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005).

It follows that an EEOC charge of race discrimination cannot support a lawsuit for sex discrimination, nor can an EEOC charge of retaliation support a lawsuit for discriminatory employment practices. *Syndor*, 681 F.3d at 593. But at the same time, a broad charge of "discrimination in promotion" or "retaliation" may support a subsequent lawsuit based on aspects of a promotional system or retaliatory conduct that differ from that detailed in the EEOC charge. *Id.* at 594. Although it is appropriate to construe EEOC charges "liberally" because "lawyers do not typically complete the administrative charges," the fact remains that a plaintiff

10

cannot bring a lawsuit on a claim unless the EEOC charge made it reasonably likely that the EEOC would discover and investigate the claim. *See Chacko*, 429 F.3d at 509; *Syndor*, 681 F.3d at 594 (the goal of administrative exhaustion is "to strike a balance between providing notice to employers and the EEOC on the one hand and ensuring plaintiffs are not tripped up over technicalities on the other.").

As noted *supra*, plaintiff's Amended Complaint asserts four claims with respect to plaintiff's allegation of discrimination and retaliation in violation of Title VII in Counts I and II: (i) transfer into a new position, (ii) denial of equal employment opportunities in training, promotion, and benefits, (iii) creation of a hostile work environment, and (iv) imposition of "disparate treatment." Am. Comp. ¶¶ 32, 36. In addition to each of the foregoing claims, which also appear in plaintiff's ADA causes of action in Counts IV and V, plaintiff further alleges discrimination in violation of the ADA through (i) defendant's failure to provide a reasonable accommodation for plaintiff's disability[9] and (ii) defendant's making unlawful inquiries into plaintiff's medical history. Am. Comp. ¶ 49.

Accordingly, to determine whether plaintiff's claims have been properly exhausted, it is necessary to compare plaintiff's allegations in her EEOC charge with the claims asserted in the Amended Complaint. The claims "reasonably related" to the EEOC allegations are administratively exhausted and properly presented here; otherwise, the claims have not been exhausted and are barred from presentation here. On review of the allegations in the EEOC charge and the claims in the Amended Complaint, it is clear that some of plaintiff's claims are exhausted and others are not.

---

[9] Specifically, plaintiff appears to argue that her June 2014 temporary assignment to Headquarters constitutes a failure to provide a reasonable accommodation.

Plaintiff's EEOC charge of discrimination contains the following allegations:

(1) Beginning in 2006, "supervisors and colleagues commented" that plaintiff was "selected because of [her] race and sex."

(2) Plaintiff was "the only person ever required to take a test…called the Minimum Staffing Qualifications Standard."

(3) In February 2010, plaintiff made an accommodation request "to avoid fire ground operations and hazardous environments," but her second-level supervisor Chief Barrero instead wanted to transfer plaintiff and "repeatedly threatened and harassed [plaintiff] because of [her] disability."

(4) In August 2013, plaintiff's new second-level supervisor Chief McNamara ordered plaintiff's supervisor to downgrade plaintiff's evaluation "because of [plaintiff's] disability."

(5) In 2014, plaintiff was removed from her position as a Fire Investigator "because of [her] sex, race, disability, and in retaliation for [her] complaints of discrimination."

*See* Def't Mem. Supp., Ex. 36. Allegation (5) is clearly "reasonable related" to plaintiff's claim in this litigation—in Counts I, II, IV, and V—that she was transferred into a new position as the result of discrimination and retaliation. Similarly, allegations (2) and (4) constitute examples of "disparate" treatment, which plaintiff also claims in Counts I, II, IV, and V. And finally, allegations (1) and (3) may be liberally construed as alleging hostile work environments, which plaintiff once again claims as part of Counts I, II, IV, and V.

Yet, entirely absent from plaintiff's EEOC charge is any indication that plaintiff was denied "equal employment opportunities" in training, promotion, or compensation as claimed in the Amended Complaint. These claims in the Amended Complaint are not reasonably related to the allegations in the EEOC charge; a reasonable administrative investigation would not have disclosed these claims. As such, these claims are unexhausted and not properly presented here.

Similarly, the EEOC charge does not encompass plaintiff's claims for failure to accommodate or making unlawful inquiries into plaintiff's medical records. Although plaintiff's

EEOC charge alleges a continuing action of disability discrimination, the only specific reference to a failure to accommodate is mentioned in the context of plaintiff's conflict with Chief Barrero in February 2010. For purposes of this litigation, however, plaintiff's claim of failure to accommodate and making unlawful medical inquiries focus on events occurring in June 2014 and interactions with Phyllis Schwartz from defendant's Human Resources department. Am. Comp. ¶¶ 17-23. Simply put, the EEOC would not be put on notice to investigate these claims in the Amended Complaint, as they focus on timeframes and actors entirely different from the timeframe and actors in the EEOC charge. *Cf. Chacko*, 429 F.3d at 506 (no administrative exhaustion where the complaint references "different time frames [and] actors" from the EEOC charge). Moreover, plaintiff concedes that she did not file an amendment to the original EEOC charge to include these allegations. *See* Tr. at 39:22-40:6.

Nonetheless, plaintiff attempts to save these claims in the present litigation by relying on the "continuing violation" doctrine to argue that these allegations are "reasonably related" to the allegations in the original charge. *See id*. This argument misunderstands the "continuing violation" doctrine, which has nothing to do with the operation of the exhaustion requirement; rather, the "continuing violation" doctrine addresses the statutory limitations period and "allows for consideration of incidents that occurred *outside the time bar* when those incidents are part of a single, ongoing pattern of discrimination, *i.e.*, when the incidents make up part of a hostile work environment claim." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (emphasis added). In short, because the claims in the Amended Complaint focus on timeframes and actors different from the allegations in the EEOC charge, the claims here are not "reasonably related" to the EEOC charge allegations, and plaintiff has not provided any authority

to suggest that the "continuing violation" doctrine excuses the duty to amend an EEOC charge (or, perhaps, to file an entirely new charge).

Accordingly, plaintiff's claims of (i) denial of "equal employment opportunities" with respect to promotion, training, and compensation in violation to Title VII and the ADA that appear in Counts I, II, IV, and V, (ii) failure to accommodate in violation of the ADA that appear in Count IV, and (iii) making improper medical inquiries in violation of the ADA that appear in Count IV, are barred by the doctrine of administrative exhaustion. The only claims that have been properly exhausted are plaintiff's claims with respect to her transfer, the Minimum Staffing Qualifications Standard, the downgrading of her performance evaluation, and the hostile work environment.

### B.

The statute of limitations also operates to bar certain of plaintiff's claims. As relevant here, an EEOC charge must be filed within 300 days after the alleged unlawful employment practice occurred.[10] 42 U.S.C. § 2000e-5(e)(1) (Title VII); *id.* § 12117(a) (ADA). Because plaintiff's EEOC charge was filed on January 29, 2014, any charged discriminatory or retaliatory conduct that allegedly violates Title VII or the ADA must have occurred no later than April 4, 2013. Importantly, there is an exception to the 300-day filing period with respect to hostile work environment claims: "the employee need only file a charge within...300 days of any act that is part of the hostile work environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002).

---

[10] Title VII and the ADA provide two applicable timeframes for filing EEOC charges of discrimination depending on whether a state or local agency enforces a state or local law that similarly bans the charged practice. Here, defendant concedes that the longer of the two timeframes—300 days—applies. *See* Tr. at 20:20-21:3.

Plaintiff's allegation that defendant discriminatorily required her to take the "Minimum Staffing Qualifications Standard" is time barred because the undisputed record facts reflect that this occurred in 2007, well beyond the 300-day limitations window. Similarly, any failure by defendant to provide a reasonable accommodation in 2010, following plaintiff's initial cancer diagnosis, is likewise barred as beyond the 300-day limitations period. Moreover, with respect to plaintiff's hostile work environment claims, plaintiff's EEOC charge lists "02-01-2010" as the earliest date of discrimination. Def't Mem. Supp., Ex. 36. Accordingly, the appropriate scope for plaintiff's hostile work environment claims goes back no further than February 2010.[11]   The foregoing analysis establishes that plaintiff's claim with respect to the Minimum Staffing Qualifications Standard, which constitutes "disparate treatment" as alleged in Count I, is time barred. Moreover, as discussed in Part II-A, *supra*, plaintiff's claims of (i) denial of "equal employment opportunities" with respect to promotion, training, and compensation in violation to Title VII and the ADA that appear in Counts I, II, IV, and V, (ii) failure to accommodate in violation of the ADA that appear in Count IV, and (iii) making improper medical inquiries in violation of the ADA that appear in Count IV, are barred by the doctrine of administrative exhaustion. Thus, plaintiff has three claims properly presented in this lawsuit. First, plaintiff has claims for discriminatory and retaliatory treatment in violation of Title VII and the ADA based on her transfer from FHMIS to the Operations Bureau (a claim that appears in Counts I, II, IV,

---

[11] Quite apart from plaintiff's representation to the EEOC that the discrimination commenced no earlier than February 2010, defendant's assertion of laches surely entitles defendant to a limited timeframe for the hostile work environment analysis. *See* Doc. 13 at 9, Seventh Defense. The Supreme Court in *Morgan* made clear that an equitable defense of laches can defeat claims that have been unreasonably delayed, thus resulting in prejudice to the employer. 536 U.S. at 121-22. As the Seventh Circuit has observed, "using laches to carve years out of a claim" may be the most sensible approach when employing the doctrine in hostile work environment claims. *Pruitt v. City of Chicago*, 472 F.3d 925, 930 (7th Cir. 2006).

and V) and for discriminatory and retaliatory treatment in violation of the ADA based on the alleged downgrading of her performance evaluation on the basis of her disability (a claim that appears as "disparate treatment" in Counts IV and V). Second, plaintiff has claims for a hostile work environment on the basis of race, sex, disability, and retaliation in violation of Title VII and the ADA (claims that appear in Counts I, II, IV, and V). And finally, plaintiff has a claim—not subject to the preceding exhaustion discussion—under 42 U.S.C. § 1983 for violation of her First and Fourteenth Amendment rights (Count III).[12]

### III.

The summary judgment standard is too well-settled to warrant extensive discussion. A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *See id.* at 325. To defeat a motion for summary judgment, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party with all reasonable inferences from those facts drawn in favor of that party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). An issue of material fact is genuine when "the evidence...create[s] [a] fair doubt; wholly

---

[12] It is worth noting here that the statute of limitations for plaintiff's § 1983 claim is two years. *See Wilson v. Garcia*, 471 U.S. 261, 276 (1985) (holding that the forum state's personal injury statute of limitations governs in a § 1983 action); Va. Code. § 8.01-243(A) (two-year statute of limitations for personal injuries).

speculative assertions will not suffice." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).

## IV.

Plaintiff's claim in Count I alleging disparate treatment on the basis of race and sex stemming from her transfer to the Operations Bureau is appropriately analyzed under the well-established *McDonnell Douglas* framework.[13] *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). Under this framework, (i) plaintiff must first establish a *prima facie* case of discrimination, (ii) then the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action giving rise to the claim, and (iii) then the burden shifts back to plaintiff to produce evidence sufficient to find that defendant's articulated reason is a mere pretext for illegal discrimination. *See id.*

To establish a *prima facie* case of discrimination under Title VII, plaintiff must show (i) membership in a protected class, (ii) satisfactory job performance, (iii) adverse employment action, and (iv) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Defendant concedes that plaintiff is a member of a protected class for the purpose of her Title VII claims but disputes all remaining elements of plaintiff's *prima facie* case. Because the record clearly reflects that plaintiff's transfer to the Operations Bureau did not constitute an "adverse employment action" and that plaintiff was not treated differently from similarly situated employees outside the protected class with respect to her transfer to the Operations Bureau, it is appropriate to assume without deciding for the purposes of the present motion that plaintiff can establish that she was

---

[13] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 802-05 (1973) (establishing "the order and allocation of proof in a private, non-class action challenging employment discrimination").

performing her job satisfactorily at the time of the alleged disparate treatment. In other words, it is unnecessary to reach or to decide every issue that the parties dispute because the undisputed record facts clearly reflect two sufficient bases upon which to conclude that plaintiff cannot establish a *prima facie* case of discrimination under Title VII based on her transfer to the Operations Bureau. Moreover, even assuming that plaintiff can establish a *prima facie* case, it is clear that the undisputed record discloses that defendant's legitimate and non-discriminatory justification is not pretextual.

## A.

With respect to plaintiff's claim that her transfer from FHMIS to the Operations Bureau was discriminatory, the Fourth Circuit's decision in *Boone v. Goldin*, 178 F.3d 253 (4th Cir. 1999), is instructive. There, the plaintiff was an African-American female who alleged a violation of the antidiscrimination and anti-retaliation provisions of Title VII when her employer reassigned her to an unfamiliar new position. *Id.* at 254. The Fourth Circuit concluded that even if the transfer caused plaintiff increased stress, the transfer did not constitute an "adverse employment action" because "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." *Id.* at 256. As the Fourth Circuit explained, "[a]bsent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support a claim of discrimination under Title VII." *Id.* Subsequently, the Fourth Circuit has reaffirmed that a transfer is only actionable as an adverse employment action if it entails a "significant detrimental effect" such as a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) (quoting *Boone*, 178 F.3d at 256-57) (internal quotations omitted).

18

The undisputed record facts disclose that plaintiff has never been demoted, her rank has never been decreased, and her transfer to the Operations Bureau actually increased the number of people over whom she had supervisory authority.[14] Moreover, plaintiff offers no record evidence to suggest that her reassignment adversely impacted her compensation or opportunities for promotion.[15] Plaintiff's argument with regard to her transfer focuses on two factors: (i) that the new job in the Operations Bureau was "qualitatively different" from her position as a Fire Investigator because of the different levels of responsibility and (ii) the Operations Bureau position put plaintiff, a cancer survivor, "in physical harm's way." P. Opp. at 26. Plaintiff's argument that her position in the Operations Bureau was qualitatively different from her position as a Fire Investigator seems to be an argument that her level of responsibility decreased. But the record actually reflects that the nature of plaintiff's responsibilities simply *changed*. Simply put, the record reflects that in lieu of her previous law enforcement duties, plaintiff was transferred to a supervisory role in a different division of the Department. Moreover, the record clearly shows that plaintiff's supervisory responsibilities over other Department employees increased after her

---

[14] Defendant asserts as an undisputed fact that plaintiff "has never been demoted, and her rank has never been reduced" and that "[a]fter her transfer to the Operations Bureau, the number of people over whom she had supervisory authority increased." Def't Mem. Supp. at 16, ¶ 61. Plaintiff does not purport to dispute the truth of these specific representations in ¶ 61 of defendant's list of undisputed facts. *See* P. Opp. at 22, ¶ 39. Accordingly, defendant's asserted fact is properly admitted under Local Rule 56(B).

[15] Although plaintiff does not cite or rely on this testimony, plaintiff's deposition presents conflicting statements concerning compensation. Specifically, plaintiff at one point testifies that her "pay changed," but when asked to explain how her pay changed, she responded that her "hourly rate decreased" but "[n]ot [her] pay." Such unclear and apparently contradictory statements are insufficient to present an issue of fact for trial. *Cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (collecting cases for the proposition that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement"). And in any event plaintiff's failure to cite or to rely on this testimony means that it may be disregarded. *See* Rule 56(c)(3), Fed. R. Civ. P. (only "the cited materials" must be considered).

transfer. Plaintiff points to no evidence to suggest that this change in responsibilities was significantly detrimental, as Fourth Circuit precedent requires. *See James*, 368 F.3d at 376 (requiring a "significant detrimental effect" such as a "decrease in compensation, job title, level of responsibility, or opportunity for promotion"). Finally, plaintiff's argument that her new position put her in "physical harm's way" fails because the record suggests that this was also true when plaintiff served as a Fire Investigator. The undisputed record reflects that *all* uniformed personnel—Fire Investigators and Operations Bureau personnel—are subject to being dispatched to address emergency situations. Plaintiff further admits that her position as a Fire Investigator involved entering "IDLH buildings," which are "buildings that posed a danger to life and health." P. Opp. at 16, ¶ 9. Notably, plaintiff offers no record evidence to suggest that the degree of risk of physical harm increased after her transfer. As such, the record does not support a conclusion that plaintiff's being placed in "physical harm's way" when assigned to the Operations Bureau was a material change from the risks entailed in her job as a Fire Investigator.

Simply put, plaintiff's objections to her reassignment to the Operations Bureau focus on the fact that the job duties were different and, in plaintiff's view, less desirable, neither of which is sufficient to constitute an adverse employment action. Without some more tangible detrimental effect such as a reduction in pay or rank, which the record does not reflect occurred, a reassignment is not actionable as an adverse employment action for purposes of Title VII. *See James*, 368 F.3d at 376. Here, plaintiff has failed to provide specific record evidence establishing a qualifying significant detrimental effect of any sort. Accordingly, the Title VII discrimination claim in Count I stemming from plaintiff's transfer to the Operations Bureau fails.

## B.

Although the conclusion that plaintiff's transfer to the Operations Bureau was not an "adverse employment action" is sufficient for defendant to prevail with respect to that claim in Count I, it is appropriate to consider that even if plaintiff's transfer were an adverse employment action, plaintiff cannot show that she was treated differently from similarly situated individuals outside of the protected class as required in the fourth prong of the *McDonnell Douglas prima facie* case framework. Although establishing comparators is not necessary as a matter of law, plaintiff must establish by some means that her circumstantial evidence supports a reasonable inference of unlawful discrimination. *See Bryant v. Aiken Regional Med. Ctrs. Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). Here, plaintiff has chosen to rely on comparators to satisfy this requirement, but her efforts in this regard fail.

The undisputed record discloses only one similarly situated comparator, Paul White, who is outside of a protected class.[16] White is a Caucasian male and a former Fire Investigator. In connection with White's unsafe handling of his service weapon, a professional standards investigation was launched and resulted in the conclusion that White committed a truthfulness violation by falsely denying any recollection of the events being investigated. As a result of this truthfulness violation, White was suspended without pay and transferred to a permanent assignment in the Operations Bureau. Thus, like plaintiff, White was found to have committed a truthfulness violation, and like plaintiff, the result was a suspension without pay and a transfer to the Operations Bureau. In sum, comparing plaintiff to White provides no basis for an inference of sex or race discrimination.

---

[16] Paul White's similarity to plaintiff is one of the many facts that plaintiff disputes without citing any record evidence as a basis. P. Opp. at 20, ¶ 27.

Plaintiff contends that other Caucasian men were treated better than plaintiff despite having committed more significant violations. Specifically, plaintiff points to Michael Reilly, David Lauler, and Joseph Vacchio as comparators. Yet, none of these individuals are "similar in all relevant respects" in that none "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (internal quotations omitted). To the contrary, the undisputed record facts reveal that none of these ostensible comparators committed a violation relating to truthfulness; plaintiff has no evidence to the contrary.[17] It follows that Reilly, Lauler, and Vacchio are not similarly situated to plaintiff "in all relevant respects" and therefore do not provide a basis for an inference of discrimination.

### C.

Assuming, *arguendo*, that plaintiff can show a *prima facie* case of unlawful discrimination, the burden now shifts to defendant to produce a legitimate, non-discriminatory justification for the allegedly disparate treatment. Defendant has done so by producing evidence that plaintiff's transfer to the Operations Bureau was the result of an internal investigation that concluded that plaintiff violated a series of Department rules by falsely verifying to a civilian property manager that her son was a Department employee. Because these findings reflected on

---

[17] The record evidence on which plaintiff relies for her accusations about Reilly, Lauler, and Vacchio provides no basis for concluding that these individual are similarly situated to plaintiff. For Reilly, plaintiff cites two pages of deposition transcript and a printout of a news article, neither of which address Reilly. For Lauler, plaintiff cites Defendant's Exhibit 3 to support the conclusion that Lauler "knowingly" received an inappropriate pay premium, a conclusion that does not follow at all from the actual contents of the exhibit. And for Vacchio, plaintiff cites a one-page printout of part of a New York state court opinion indicating that Vacchio shot someone while on duty as a police officer, which is not a truthfulness violation that would prompt a *Brady* concern.

plaintiff's truthfulness, and because plaintiff's position as a Fire Investigator required her to be able to testify effectively in court, the Department concluded that plaintiff could not properly perform this duty given *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Specifically, plaintiff's credibility was jeopardized and her testimony would be subject to impeachment in any criminal case in which she participated in her official role. As a result of this *Brady* issue, plaintiff was reassigned to a role that would not entail the essential Fire Investigator's function of providing reliable testimony in court.[18]

Given that defendant has adduced evidence of a legitimate and non-discriminatory reason for plaintiff's reassignment, the burden now shifts back to plaintiff to show that the proffered justification was a mere pretext for discrimination. In order to show pretext with respect to Count I, plaintiff argues that there is no factual basis for defendant's conclusion. This attack on the factual basis for plaintiff's transfer to the Operations Bureau fails.

Plaintiff's argument has several layers. First, plaintiff essentially argues that defendant could not prove in court that she actually committed the conduct alleged, namely lying and forgery, because there is no evidence of fraudulent intent. P. Opp. at 26-27. And, plaintiff continues, if there was no intent to deceive, then there was no felonious conduct, and thus plaintiff does not pose a problem under *Brady*. Tr. at 25:5-7. Thus, plaintiff argues that defendant's conclusion about plaintiff's truthfulness violation did not warrant her transfer to the

---

[18] It is well-settled that defendant must satisfy its burden of production by providing admissible evidence. 1 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 35 (4th ed. 2007). As noted *supra* n.6, despite plaintiff's objections to the contrary, defendant's evidence of a legitimate reason for its decision to transfer plaintiff is admissible. This evidence includes (i) the relevant Department rules, Ex. 18, (ii) an affidavit from Guy Morgan, the investigator, explaining his conclusions (which is not offered to prove the truth of the allegations), Ex. 16, and (iii) deposition testimony and an affidavit from Fire Chief Bowers, who made the decision to transfer plaintiff, explaining that he relied on Morgan's conclusions, Exs. 24-25. *See* Rule 602, Fed. R. Evid.

Operations Bureau because "there are other things that could have been used to deal with [that] issue." Tr. at 30:11-13.

At its core, plaintiff's attack on defendant's investigation is a request for judicial intervention "as a kind of super-personnel department weighing the prudence of employment decisions," a practice in which the federal courts do not engage. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). To be sure, one way to create a factual issue as to pretext is to present sufficient evidence to create an inference that the proffered legitimate reason for the employment decision has no basis in fact. *Sharif v. United Airlines, Inc.*, No. 14-cv-1294, 2015 WL 4042173, at *6 (E.D. Va. July 1, 2015). But in the Fourth Circuit, as elsewhere, a plaintiff must do more than demonstrate that an employer's belief is incorrect; plaintiff must present evidence reasonably calling into question the honesty of the employer's belief.[19] *See DeJarnette*, 133 F.3d at 299 (citing *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (4th Cir. 1997)). An employer's proffered legitimate basis for an employment action is considered honestly held if the employer can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. *See Murphy v. Oh. State Univ.*, 549 F. App'x 315, 322 (6th Cir. 2013). The employer does *not* need to show that it conducted a perfect investigation; rather, the employer's decision need only be "reasonably informed." *Id.*

---

[19] Indeed, it is widely accepted that "[c]ourts generally review an employer's proffered explanation in a subjective light, meaning that they look not to whether the explanation is true, but whether the employer honestly believed it was true." Lindemann & Grossman, *supra* n.18, 86-87. It is worth noting that the Supreme Court routinely cites the Lindemann & Grossman treatise. *E.g., Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004); *Morgan*, 536 U.S. at 115; *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

It must be acknowledged at the outset that plaintiff does not and cannot deny that she confessed to untruthfulness during the course of the Department's investigation into whether she provided false information about her son's employment with the Department. Plaintiff argues that when she admitted to lying, she was conceding *only* that she made a statement that was technically untrue but that she did so without any intent to deceive. *See* Tr. 23:20-24:2. Certainly, the undisputed record reflects that plaintiff's admission included that qualification that plaintiff was operating "with the understanding that [her son] would start up [with the Department] in January." Def't Mem. Supp., Ex. 17 at 38:17-29. But this does not undermine the fact that plaintiff *also* acknowledges that what she did was wrong, *id.* at 1:01:09-18, and that she had no right to make the statements she made, *id.* at 1:25:46-51. Nothing plaintiff argues calls into question the ultimate conclusions reached in the investigation. That is, just because plaintiff denies that she acted with a fraudulent or felonious intent does not mean that the Department could not reach the conclusion that she knowingly made false statements based on other facts disclosed in the investigation.

With respect to the quality of the investigation, the undisputed record facts reflect that Guy Morgan, the Department's investigator, interviewed the rental property manager to whom the alleged misrepresentations were made, reviewed the property manager's documents bearing the misrepresentations, and interviewed the human resources official whose signature was allegedly forged on the fax message in order to perpetrate the misrepresentation.[20] Def't Mem.

---

[20] As has been noted throughout this Memorandum Opinion but bears repeating, plaintiff's only objection to defendant's reliance on Guy Morgan's affidavit to establish the conduct of the investigation is that the affidavit is inadmissible hearsay. This is incorrect. Morgan clearly has personal knowledge of the conduct of the investigation, and his testimony as to how he conducted the investigation would be admissible at trial. *See* Rule 602, Fed. R. Evid. The

Supp., Ex. 16, ¶¶ 8-10. Morgan also confirmed that plaintiff was working on the day the alleged

misrepresentations were communicated and that she made and received numerous telephone

calls to and from the property manager on that date. *Id.* ¶ 11. And of course, Morgan also

interviewed plaintiff directly. Over the course of this interview, plaintiff attempted to shift blame

to her son and represented that Department employees Laura Cosner and David Lauler could

confirm that plaintiff's son was in plaintiff's office around the time the alleged

misrepresentations were made. *Id.* ¶ 12. Morgan interviewed Cosner and Lauler, neither of

whom confirmed plaintiff's story, and Morgan further interviewed plaintiff's supervisor and

partner, Paul Masiello, who worked the same schedule and shift as plaintiff, and he too could not

confirm plaintiff's story. *Id.*

To the extent plaintiff argues that any procedural irregularities tainted the Department's

investigation, she simply asserts that she was given a letter suspending her from law enforcement

and placing her on administrative leave before she was interviewed. P. Opp. at 7, ¶ 26. This

assertion falls far short of undermining the adequacy of the investigation and the accuracy of the

conclusions reached. The undisputed record detailing the conduct of the investigation makes

clear that plaintiff's suspension prior to her interview was reasonable as there was then sufficient

reason to believe that plaintiff had committed the alleged violations. Conceivably there are ways

in which the Department's investigation could have been improved, but the standard is

reasonableness, not perfection. *See Murphy*, 549 F. App'x at 322. On the undisputed factual

record, no reasonable jury could find that the Department's conclusion that plaintiff committed

---

operative inquiry at this stage is simply whether defendant acted with an honest belief of
misconduct, which in turn requires nothing more than a reasonably informed decision based on
an adequate investigation, both of which occurred. *See Murphy*, 549 F. App'x at 322. Plaintiff
offers no evidence to contradict Morgan's version of how the investigation was handled. P. Opp.
at 18-19, ¶¶ 17-22.

the alleged violations was not based on particularized facts that were uncovered through an acceptably thorough and fair investigation. Accordingly, there are no grounds to conclude that defendant did not honestly believe that plaintiff committed the alleged truthfulness violations.

Plaintiff's protest that she does not pose a problem under *Brady* fails for similar reasons. The undisputed record evidence shows that defendant subjectively believed that plaintiff posed a *Brady* issue.[21] Even assuming that defendant's subjective belief is not the appropriate standard, plaintiff's argument that she is not a *Brady* problem fails. Evidence of an investigation culminating in a finding of untruthfulness would be admissible as relevant and material under Rule 608(b), Fed. R. Evid., to impeach plaintiff's character for truthfulness on cross-examination. *See, e.g., United States v. Parker*, 790 F.3d 550, 559-62 (4th Cir. 2015) (holding that evidence of an ongoing SEC fraud investigation was *Brady* evidence because it was admissible and material). Moreover, plaintiff's suggestion at oral argument that defendant could have done something other than reassign plaintiff in order to remedy the *Brady* problem has no basis[22] and runs afoul of the settled principle that it is not the province of the federal courts to decide whether an employment decision "was wise, fair, or even correct" so long as it was not based on an unlawful motive. *Giannopoulos*, 109 F.3d at 411. In any event, providing reliable testimony was an essential duty of the job, and defendant had no obligation to change the

---

[21] *See* Def't Mem. Supp. at 10, ¶ 37 (stating as an undisputed fact that the basis of plaintiff's transfer was the problem she presented under *Brady*); P. Opp. at 19, ¶ 23 (denying the defendant's statement of fact in ¶ 37 without citation to record evidence, thus rendering defendant's ¶ 37 admitted under Local Rule 56(B)).

[22] Plaintiff suggested at oral argument that "there are other things that could have been used to deal with [the *Brady*] issue." Tr. at 30:11-13. Plaintiff has not articulated what these "other things" are. Moreover, it is difficult to see how to remedy the *Brady* issue other than by removing plaintiff from her position or by altering the essential functions of the position to remove testifying in court from plaintiff's list of duties, which the law does not require.

essential duties of the job to accommodate someone reasonably believed to have committed a serious misconduct violation.

Moreover, although plaintiff does not raise additional grounds to allege pretext, it is worth briefly reviewing two common methods of establishing pretext in order to underscore the soundness of the conclusion reached here that plaintiff cannot satisfy her burden to show pretext warranting trial. First, the record is devoid of any evidence that the final decision-maker, Fire Chief Bowers, ever made any comments suggesting animus based on race or sex, or even anything personally disparaging about plaintiff. *Cf.* Lindemann & Grossman, *supra* n.18, 65 n.208 ("Comments by non-decision makers consistently have been held to be insufficient evidence of pretext even to defeat an employer's motion for summary judgment."). Second, as noted in Part IV-B, *supra*, there is no comparative evidence from which an inference of discrimination can be drawn.[23]

Accordingly, even assuming that plaintiff has a *prima facie* case of disparate treatment as to her transfer to the Operations Bureau, the undisputed record facts point convincingly to the conclusion that defendant's proffered legitimate reason for the action was not a pretext for discrimination, and no reasonable jury could conclude otherwise. As such, summary judgment must be entered in favor of defendant on the disparate treatment claim in Count I.

---

[23] Plaintiff's opposition highlights the fact that Fire Chief Bowers testified during his deposition that he has never transferred any other employee out of FHMIS for a *Brady* issue. This argument is a red herring. The undisputed record facts show that Chief Bowers has only been Fire Chief since 2013, but the relevant comparator who incurred the same type of transfer as plaintiff for the same type of misconduct was transferred over ten years earlier. Accordingly, there is no factual dispute on this point; it is true that there is a relevant comparator—White—who received equal treatment—a transfer to the Operations Bureau—just as it is true (and entirely unremarkable) that Bowers has only ever transferred plaintiff as the result of a *Brady* issue in his brief tenure as Fire Chief. *See* Def't Mem. Supp., Ex. 3, ¶ 14; Ex. 24, ¶ 1.

## V.

In Count II, plaintiff re-alleges that her transfer from FHMIS to the Operations Bureau violated Title VII, this time on the basis that it was retaliatory. Once again, the *McDonnell Douglas* framework applies, meaning (i) plaintiff must first establish a *prima facie* case of retaliation, (ii) then the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action giving rise to the claim, and (iii) then the burden shifts back to plaintiff to produce evidence sufficient to find that defendant's articulated reason is a mere pretext for illegal retaliation. *See Foster*, 787 F.3d at 250. To establish a *prima facie* case, a retaliation plaintiff under Title VII must show (i) that she engaged in a protected activity, (ii) that she suffered an adverse employment action, and (iii) that there is a causal link between the protected activity and the employment action. *See id.* Defendant assumes for the purpose of summary judgment that plaintiff engaged in protected activity as required for her retaliation claims, but all remaining elements of plaintiff's *prima facie* cases remain disputed.

The first basis on which plaintiff's claim in Count II fails is identical to the first basis on which the claim failed under Count I, namely that plaintiff's transfer to the Operations Bureau does not constitute an "adverse employment action." Thus, for the same reasons stated in Part IV-A, *supra*, plaintiff cannot establish a *prima facie* case of retaliation under Title VII.

But even assuming plaintiff could prove a *prima facie* case of retaliation, plaintiff cannot show that defendant's proffered legitimate and non-retaliatory reason for the transfer is a mere pretext for retaliation. As in Count I, defendant submits that plaintiff's transfer to the Operations Bureau was the result of an internal investigation that concluded that plaintiff violated a series of Department rules, including those touching on truthfulness. In response, plaintiff presents two theories of pretext: (i) that there is no factual basis for defendant's conclusion (the same

argument advanced as to Count I) and (ii) that the decision-makers knew of plaintiff's complaints against Chief Barrero and therefore intentionally placed her into a high-risk position in the Operations Bureau.

Plaintiff's first pretext argument fails for the same reason that it failed under Count I. Indeed, the analysis in Part IV-C, *supra*, applies with full force under Count II because plaintiff cannot show that defendant did not subjectively believe that she committed a truthfulness violation that warranted the challenged transfer. Plaintiff's second argument fares no better; plaintiff cites no evidence in the record to support her allegation that the decision-maker knew of plaintiff's protected activity. *See* P. Opp. at 9-10, ¶ 42; 19, ¶ 23 (making the conclusory allegation without citing record evidence). Although the record reflects that Chief Baker knew of plaintiff's complaints about Chief Barrero, the record does *not* reflect that the ultimate decision maker, Fire Chief Bowers, knew of plaintiff's complaints.

Moreover, the law is now clear that it is not sufficient for a Title VII retaliation plaintiff to show that retaliatory animus was one of several motivating factors underlying an employment decision. Rather, a retaliation plaintiff must show that the unlawful retaliation would not have occurred in the absence of the alleged retaliatory animus. *See Foster*, 787 F.3d at 249. Put differently, if the same adverse action would have occurred even in the absence of the employer's wrongful retaliatory animus, then plaintiff's claim must fail. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013) ("It is thus textbook tort law that an action 'is not regarded as a cause of an event if the particular event would have occurred without it.'"). Because, as noted *supra* n.21, plaintiff has admitted defendant's version of the facts—that the transfer was because of the conclusion that plaintiff presented a *Brady* problem—it cannot be said that the transfer would not have occurred in the absence of retaliatory animus.

30

Accordingly, even assuming that plaintiff has established a *prima facie* case of retaliation as to her transfer to the Operations Bureau—which she has not—the undisputed record facts are such that no reasonable jury could conclude that defendant's proffered legitimate reason for the transfer was pretextual or retaliatory, and summary judgment must therefore be entered in favor of defendant on the disparate treatment retaliation claim in Count II.

## VI.

In Count IV, plaintiff once again challenges her transfer to the Operations Bureau—this time as discriminatory in violation of the ADA—in addition to alleging that her performance review was downgraded based on her disability. Discrimination claims under the ADA, like discrimination claims under Title VII, utilize the *McDonnell Douglas* framework. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). Thus, (i) plaintiff must first establish a *prima facie* case of discrimination, (ii) then the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action giving rise to the claim, and (iii) then the burden shifts back to plaintiff to produce evidence sufficient to find that defendant's articulated reason is a mere pretext for illegal discrimination. *See id.*

To establish a *prima facie* case of discrimination under the ADA, plaintiff must show (i) that she was a qualified individual with a disability, (ii) that she was satisfactorily performing her job, (iii) that she suffered an adverse employment action, and (iv) that the adverse employment action "occurred under circumstances that raise a reasonable inference of unlawful discrimination." *See id.* Defendant contests each element of plaintiff's *prima facie* case, but it is unnecessary to resolve each dispute because the undisputed record facts disclose that neither plaintiff's transfer nor the downgrading of her performance review constitutes a qualifying "adverse employment action."

With respect to plaintiff's transfer to the Operations Bureau, the adverse employment action analysis is identical to that discussed in Part IV-A, *supra*. Similarly, plaintiff's claim that her performance evaluation was downgraded based on her disability in violation of the ADA is not sufficient, absent more, to constitute an adverse employment action.[24] A negative performance evaluation is only actionable as an adverse employment action where the employer subsequently uses the evaluation as a basis to alter the terms or conditions of the recipient's employment. *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 652 (4th Cir. 2002) (so holding in the Title VII context) (citing *Spears v. Mo. Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)).[25] Thus, in *Thompson* the Fourth Circuit affirmed summary judgment against a plaintiff who "did not adduce evidence that the [allegedly adverse] appraisal affected the terms, conditions, or benefits of his employment." *Id.* That is precisely the situation here; plaintiff has offered no record evidence to suggest that defendant used the performance evaluation at issue as a basis for any subsequent decisions about the terms or conditions of

---

[24] It must also be noted that the present record reflects that the basis for the downgrade was that plaintiff was on light duty, *not* that she was disabled. *See* P. Opp., Ex. D at 18 ("I was told by Capt. Masiello that Chief McNamara told him to change [plaintiff's yearly employee evaluation] because I could not get an exceptional evaluation when I was on light duty."). Moreover, the undisputed record reflects that official Department policy allows light duty assignments only "due to an employee's inability to perform the duties *required* of his or her position" (emphasis added). Def't Mem. Supp., ¶ 14; *id.* Ex. 11; P. Opp., ¶ 7 (disputing the fact without citation to record evidence). And, importantly, the ADA only protects "qualified individual[s]" with a disability, which are individuals who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." *See* 42 U.S.C. §§ 12111(8) (defining "qualified individual"), 12112(a) (defining the scope of coverage). Thus, if plaintiff was limited to light duty consistent with Department policies, then (i) she was not a "qualified individual" with a disability because she could not perform the required duties of her position and (ii) adverse employment actions taken against her at that time, if any, are accordingly not actionable under the ADA.

[25] Because Title VII claims and ADA claims proceed under nearly identical frameworks, there is no reason to believe that an "employment action" would fail to qualify as "adverse" in one context but not the other.

plaintiff's employment. In the absence of such a "tangible effect upon the recipient's employment," a "poor performance rating does not...constitute an adverse employment action."[26] *Spears*, 210 F.3d at 854. Accordingly, any adverse evaluation motivated by plaintiff's disability is not an adverse employment action on this record.

Once again, even assuming that plaintiff could establish a *prima facie* case with respect to her transfer to the Operations Bureau, she would be unable to show that defendant's proffered legitimate and non-discriminatory explanation for the transfer was a mere pretext for discrimination. Again, defendant submits that plaintiff's transfer to the Operations Bureau was the result of an internal investigation that concluded that plaintiff violated a series of Department rules, including those touching on truthfulness. In Count IV, plaintiff offers two arguments to establish pretext: (i) that there is no factual basis for defendant's conclusion (as argued in Counts I and II) and (ii) that the decision-makers knew of plaintiff's medical condition and therefore intentionally placed her into a high-risk position in the Operations Bureau.

Plaintiff's first argument fails for precisely the same reasons as the same argument failed under Counts I and II, namely that plaintiff cannot show that defendant did not subjectively believe the proffered basis. And plaintiff's second argument, like her second argument in Count II, fails because plaintiff cites no evidence in the record to support her allegation of the decision-maker's knowledge. *See* P. Opp. at 9-10, ¶ 42; 19, ¶ 23 (making the conclusory allegation without a single citation to record evidence). Indeed, the record actually contradicts the assertion

---

[26] It is worth noting also that the record does not reflect that plaintiff's performance evaluation was "poor" or even mediocre; rather, plaintiff's allegation is merely that the evaluation was downgraded from "exceptional," which leaves open the distinct possibility that it was still an objectively positive evaluation. P. Opp., Ex. D at 18. Moreover, if plaintiff could not perform the required duties of her position—as her placement on light duty indicates—then it is reasonable that an employer would not afford an "exceptional" rating. After all, it is difficult to be exceptional at a job one cannot actually perform.

that defendant knowingly placed plaintiff in a high-risk position for which she was not equipped because of her medical condition. Plaintiff concedes that she was capable of performing in the Operations Bureau as of August 2013, *id.* at 10, ¶ 46, and her medical records reflect that she was fully fit for operational status as of that same time. *See* Def't Reply (Doc. 45), Ex. 8 (August 2, 2013 medical release to return "to full duty work immediately"). Thus, plaintiff's conclusory allegation that the decision-maker knew that she would face medical difficulty in the Operations Bureau is without support in the record. Finally, although plaintiff does not raise this as a grounds to argue pretext, it is worth mentioning that the record does not reflect that Fire Chief Bowers, the final decision-maker regarding plaintiff's transfer, ever made any comments suggesting animus based on disability, or even anything personally disparaging about plaintiff. *Cf.* Lindemann & Grossman, *supra* n.18, 65 n.208 ("Comments by non-decision makers consistently have been held to be insufficient evidence of pretext even to defeat an employer's motion for summary judgment.").

For the foregoing reasons, plaintiff's ADA claims of disparate treatment stemming from her transfer to the Operations Bureau and the downgrading of her performance evaluation both fail. As such, summary judgment for defendant in this regard is appropriate.

## VII.

In Count V plaintiff repackages her disparate treatment claims from Count IV as ADA retaliation claims. As noted, ADA claims utilize the *McDonnell Douglas* framework such that (i) plaintiff must first establish a *prima facie* case of retaliation, (ii) then the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action giving rise to the claim, and (iii) then the burden shifts back to plaintiff to produce evidence

34

sufficient to find that defendant's articulated reason is a mere pretext for illegal retaliation. *See*

*Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

In order to establish a *prima facie* case of retaliation under the ADA, plaintiff must show

(i) that she engaged in a protected activity, (ii) that she suffered adverse employment action, and

(iii) that there is a causal link between the protected activity and the employment action. *See*

*Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). Defendant assumes for the

purpose of summary judgment that plaintiff engaged in protected activity, but the remaining

elements of the *prima facie* case are in dispute.

Plaintiff's claims, both as to her transfer to the Operations Bureau and the downgrading

of her performance evaluation, fail at the outset because neither constitutes an "adverse

employment action" for the reasons set forth in Part VI, *supra*. Moreover, as to the transfer to the

Operations Bureau, plaintiff would be unable to show that defendant's proffered legitimate and

non-retaliatory justification for the employment action was a mere pretext. As discussed in Part

IV-C, *supra*, plaintiff's attack on the factual basis for defendant's proffered explanation is

unavailing. Moreover, as discussed in Part V, *supra*, plaintiff also cannot meet the heightened

causation standard for a retaliation claim, namely that an adverse employment action is only

actionable as retaliation if retaliatory animus was the "but for" cause of the action.[27] And finally,

as discussed in Parts V and VI, *supra*, there is no basis in the record from which to conclude that

the relevant decision-maker, Fire Chief Bowers, knew of plaintiff's complaints about Chief

---

[27] The ADA prohibits retaliation "because" of an individual's protected activity. 42 U.S.C. §
12203(a). In comparable contexts, the Supreme Court has recently made it clear that the "but
for" standard applies when Congress uses "because" language, and there is no reason to suspect
that the same rule does not apply to the ADA. *See Nassar*, 133 S. Ct. at 2528 ("because"
language in Title VII, 42 U.S.C. § 20003-3(a), requires "but for" causation); *Gross v. FBL Fin.
Servs., Inc.*, 557 U.S. 167, 176 (2009) ("because" language in the Age Discrimination in
Employment Act, 29 U.S.C. § 623(a)(1), requires "but for" causation).

Barrero or knew of any medical difficulty that plaintiff might have in the Operations Bureau. Thus, plaintiff cannot meet her burden under the *McDonnell Douglas* framework with respect to her ADA retaliation claims. As such, summary judgment on these claims in favor of defendant is once again appropriate.

## VIII.

Plaintiff's only remaining claims in Counts I, II, IV, and V focus on her allegations of a hostile work environment. To survive summary judgment on these claims, plaintiff must demonstrate that a reasonable jury could find (i) unwelcome harassment; (ii) based on membership in a protected class or based on protected activity; (iii) that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (iv) some factual basis on which to impute liability for the harassment to the employer. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).

Importantly, hostile work environments are not *per se* forbidden under Title VII and the ADA; rather, Title VII and the ADA only prohibit hostile work environments *based on* a statutorily protected characteristic (*e.g.*, race, religion, and sex) or activity (*e.g.*, opposing discrimination). Accordingly, no matter how difficult or stressful supervisors or coworkers make one's job, the conditions are only actionable under Title VII and the ADA if there is "some independent evidence of...animosity" towards a protected characteristic or activity. *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 143 (4th Cir. 2007). The Fourth Circuit has repeatedly indicated that at the summary judgment stage it is appropriate to disregard conclusory statements and focus only on those allegations that indicate animosity based on protected characteristics or activity. *See id.* at 142-43; *Baqir v. Principi*, 434 F.3d 733, 746-47 (4th Cir. 2006); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998).

36

It is well-settled that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which includes considering the frequency of the conduct, its severity, whether it is physically threatening or humiliating (or a "mere offensive utterance"), and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Moreover, a work environment is only hostile if a plaintiff subjectively perceived it as such *and* a reasonable person would find it abusive. *See id.* at 21-22. Importantly, the Supreme Court has "made it clear that conduct must be *extreme* to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (emphasis added). Thus, hostile work environment plaintiffs "must clear a high bar in order to satisfy the severe or pervasive test," and the task on summary judgment "is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion," *i.e.*, instances in which the environment was rife with discriminatory or retaliatory conduct that was "persistent, demeaning, unrelenting, and widespread" and "aimed to humiliate, ridicule, or intimidate." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (internal quotations omitted).

### A.

Because a hostile work environment claim requires a "totality of the circumstances" review, it is appropriate to begin the analysis by cataloguing the relevant circumstances occurring within the relevant timeframe.[28]

---

[28] The 28 circumstances listed are derived from (i) the defendant's undisputed facts that are not properly disputed and from (ii) Plaintiff's Summary Judgment Exhibit D, Response 1, which lists a number of allegations. For the purposes of summary judgment, plaintiff's allegations are assumed to be true. Related allegations have been grouped together. Citations are provided when material is quoted directly.

1. In February 2010, after plaintiff's cancer diagnosis, Chief Barrero informed plaintiff that she would need to be transferred out of FHMIS because the Department was short staffed. Plaintiff spoke with two other officials to inquire whether this would be legal, and no transfer resulted.

2. In August 2010, plaintiff requested a light duty assignment. The request was granted, and plaintiff remained in FHMIS by temporarily swapping positions with a technical support worker. Despite the fact that Department policy limited light duty assignments to one calendar year, plaintiff requested an extension in July 2011, which was granted in August 2011. Plaintiff remained on light duty until December 2011.

3. In November 2010, Chief Barrero again informed plaintiff that she would need to be transferred out of FHMIS because of hardship on other Fire Investigators. No transfer followed, but plaintiff alleges that Chief Barrero tried to make her job difficult by sending her out on work calls despite being on light duty.

4. In August 2011, plaintiff won a Department award, and plaintiff claims that Chief Barrero did not wish to have a picture taken with her.

5. In August 2011, when plaintiff offered to assist Chief Reilly with a task he declined because he did not want plaintiff "to break a nail." Chief Reilly later suggested that plaintiff should speak with the Department's counselor, which plaintiff alleges was a tactic Reilly used to target women for transfers out of FHMIS.

6. In April 2012, after plaintiff's cancer returned from remission, plaintiff requested light duty again, which Chief Barrero approved.[29]

7. In May 2012, Chief Barrero instructed plaintiff to turn in her weapon. Plaintiff complained to Deputy Chief Baker, who overruled Chief Barrero. The next day Chief Barrero told plaintiff he was upset with her because she was making him look bad.

8. On August 7, 2012, Chief Barrero called plaintiff into his office, asked her how she was doing, and informed her that she would be transferred. Thereafter, plaintiff reports that she was required to stay in the office for staffing reasons rather than be allowed to participate in training opportunities. According to plaintiff, "the working environment was unbearable." P. Ex. D at 14. Plaintiff was not transferred.

9. On August 20, 2012, plaintiff complained to Deputy Chief Baker about Chief Barrero's "threatening behavior and constant harassment and bullying." *Id.* The next week, Barrero told plaintiff that she was jeopardizing his promotion with her complaints. *Id.* at 15. Importantly, plaintiff has conceded "that her complaint to Baker resolved the issue [with

---

[29] Plaintiff disputes that Chief Barrero approved the light duty request, but the record evidence on which plaintiff relies is her own deposition testimony, in which she expressly says that Chief Barrero approved the request. P. Opp. at 17, ¶ 14 (citing Tomasello Dep. at 184-185).

Chief Barrero] in its entirety." *See* Def't Mem. Supp. at 6-7, ¶ 26; P. Opp. at 18, ¶ 16 (disputing portions of defendant's ¶ 26, but *not* the quoted portion).

10. In March 2013, Chief Barrero told plaintiff not to park in an upper parking lot, although she claims other investigators were allowed to do so. Later that month, plaintiff did park in the upper lot and was verbally reminded not to do so. Plaintiff alleges that an African-American male who had previously worked in FHMIS had similarly not been allowed to park in this particular parking lot.

11. In March 2013, Chief Reilly asked plaintiff why she did not take alternative placement and whether it was true that her cancer had a high probability of returning.

12. In March 2013, Chief Barrero told plaintiff that he blamed her for his difficulty obtaining a promotion. Plaintiff's complaints about Barrero's harassment were brushed aside by Chief Reilly.

13. In June 2013, plaintiff's son was hired by the Department. He and another firefighter's son were singled out and told that it did not matter who their parents were and that there would be no special treatment. Over the next several weeks, plaintiff's son was "harassed" and "embarrassed" before being terminated by Chief Barrero. Plaintiff and her son opposed the termination, and Chief Barrero told plaintiff that she would not win this one. P. Ex. D at 16.

14. In July 2013, plaintiff was informed that she was removed from any and all tactical classes at the police range.

15. In October 2013, plaintiff found a bag containing a substance resembling marijuana in her work vehicle. The substance did not test positive for marijuana, and no other actions or investigations were taken. Plaintiff confirms that her work vehicle is "constantly" used by other investigators. *Id.* at 17.

16. In August 2013, plaintiff reports that she was "made to feel on a day to day base [sic] that [her] job was in jeopardy." *Id.* at 18.

17. In August 2013, plaintiff requested the use of a newer work vehicle. Although others were available, the request was denied. Other investigators were allowed to use the vehicles of their choice.

18. In August 2013, plaintiff alleges that her performance evaluation was lowered because she was on light duty.

19. In November 2013, plaintiff was the subject of an investigation alleging that she lied about her son's employment in order to help him to secure an apartment.

20. In January 2014, Chief Bowers granted plaintiff's request that she not be terminated for her misconduct violations and instead reduced plaintiff's discipline to a ten-day suspension without pay.

21. In January 2014, plaintiff was required to complete a re-entry training program as part of her transition to the Operations Bureau. While at the academy, plaintiff alleges that Chief Barrero "continued to harass" her and "provided [a] hostile working environment." *Id.* at 20. Plaintiff argues that her time at the academy was just harassment. During one specific task (called "the Maze") plaintiff alleges that she was treated worse than a Caucasian male who was also required to complete the task.

22. In January 2014, plaintiff was assigned to Fire Station 10, which in her view has a reputation for mistreatment of women and minorities. Chief Barrero denied her request to be sent elsewhere. Upon arrival, plaintiff "was met with a cold welcome." *Id.* at 22. Plaintiff was soon transferred to another station.

23. In January 2014, Chief Barrero reprimanded plaintiff for taking "liberal leave" on a snow day because plaintiff was an essential employee.

24. In January 2014, plaintiff reports that "constant harassment" was weighing her down so she asked to go home on sick leave. Chief Barrero denied the request, stating that "sick leave is for people who are sick." *Id.* at 23. Plaintiff reports that she had to go to the emergency room twice "due to stress and hostile work environment." *Id.* at 24.

25. In January 2014, plaintiff alleges that Chief McNamara instructed her to return certain property from her time at FHMIS, which had apparently been lost. Plaintiff complains that she was not afforded an opportunity to inventory these items when she was transferred and that other individuals might have been responsible for their loss.

26. In February 2014, after complaining about Chief Barrero, plaintiff was transferred to Fire Station 38, where Chief Hawkins had requested her.

27. In June 2014, plaintiff requested "day work" and a disability accommodation due to illness. Plaintiff contends that the firefighter union did not assist her to the same extent it helped a similarly situated Caucasian male. Plaintiff's request was granted and she was given a temporary assignment in Headquarters despite the fact that plaintiff at the time had a Class A medical status, meaning she was classified as fit for full operational duty.

28. In July 2014, Phyllis Schwartz from Human Resources, who handles ADA requests, approached plaintiff with regard to plaintiff's attempt to secure an ADA accommodation. At one point, Schwartz stated that plaintiff "looked fine." Schwartz then requested certain information for the purpose of determining a reasonable accommodation. Plaintiff requested time to consult with her lawyer and after "much debate" Schwartz agreed. *Id.* at 27. The next day Schwartz asked for plaintiff's permission to speak with plaintiff's doctor. Later, Schwartz again sought plaintiff's permission to speak with plaintiff's doctor; plaintiff refused and Schwartz became "irritated, demanding and threatening." *Id.* at 28. When plaintiff left Schwartz's office after that encounter, Guy Morgan followed her to the elevator "as if to try to intimidate" plaintiff. *Id.* at 29. The next day, Schwartz sent plaintiff a follow up email that

plaintiff alleges was "to harass and threaten" her. *Id.* Plaintiff then gave Schwartz permission to speak with plaintiff's doctor "[t]o cease the harassment." *Id.*

## B.

As analysis now properly turns to evaluating these circumstances, it is important to note at the outset that plaintiff's vague and conclusory allegations of "harassment," a "hostile work environment," or "threatening" behavior—such as in circumstances 8, 9, 13, 16, 21, 24, and 28—are insufficient to survive a motion for summary judgment; rather, the focus must be on the accusations that contain some particularity. *See Causey*, 162 F.3d at 801 (disregarding "conclusory" allegations in answers to interrogatories and limiting the analysis to the "sufficiently detailed" accusations).

Moreover, many of the relevant circumstances reflect no explicit or implicit animus on any protected basis.[30] Instead, plaintiff admits that her allegations of unlawful animus are based on "dealings" with the named individuals, "repetitive treatment," and "conflicts." Tomasello Dep., 199-201, 207, 210, 245. In short, plaintiff has not articulated any specific, concrete basis from which to infer that many of her accusations constitute treatment "because of" her protected characteristics or activities. In fact, for several of plaintiff's accusations she has in her own presentation of events admitted that the motivation was *not* a protected characteristic or activity. In circumstance 7, for instance, plaintiff acknowledges that her conflict with Chief Barrero was because she was making him look bad, which is unrelated to her protected characteristics or activity. Importantly, plaintiff's complaint about Chief Barrero that gave rise the confrontation in circumstance 7 was *not* a complaint about discrimination; rather, plaintiff had complained that

---

[30] Specifically, circumstances 4, 7, 9, 12, 13, 14, 15, 16, 17, 19, 21, 22, 23, and 25 do not provide any basis for concluding that any specific characteristic or activity—or combinations of characteristics or activities—in any way motivated the behaviors alleged.

Chief Barrero was violating internal Department rules. And in circumstance 13, plaintiff

acknowledges that her son *and another employee's child* were *both* called out on the basis that

they had parents in the Department. Finally, circumstance 19—the basis of much of the analysis

in Parts IV-C, V, VI, and VII, *supra*—fails to disclose any animus because the evidence clearly

shows that the organizational investigation was reasonable in nature, scope, and rigor, and

defendant was reasonable in relying on the particular factual conclusions reached.

### 1.

With regard to plaintiff's race and sex based hostile work environment claims, which

arise from Count I, the Fourth Circuit's *Gilliam* decision is particularly instructive. There, the

plaintiff alleged racially hostile work environment created by her supervisor. Although the

record there reflected that the supervisor never made any racial comments or slurs to or about the

plaintiff, the plaintiff claimed in her deposition that she inferred racial animus from the

supervisor's actions. 474 F.3d at 135. Significantly, the plaintiff in *Gilliam* failed to show that

she was treated differently than comparable individuals outside of the protected class. *Id.* at 142.

The Fourth Circuit concluded that there was no "independent evidence of racial animosity"

sufficient to support a *prima facie* case of a racially hostile work environment. *Id.* at 143. The

same result obtains here for the same reasons. Plaintiff does not allege that any supervisor or

coworker ever made an overtly racial comment, but instead seeks to infer racial animus from

actions that are neutral on their face and for which there is no evidence of differential treatment

based on race. And as to sexual harassment, only one of plaintiff's allegations—circumstance

5—overtly suggests a sex-based motivation, and even then on the spectrum of severity the

comment about "break[ing] a nail" is quite benign and hardly rises to the level of severity

required for actionable sexual harassment in the workplace. *See Harris*, 510 U.S. at 21 (hostile

work environment requires a workplace so "permeated" with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive" to alter the conditions of employment) (internal quotations omitted). Moreover, plaintiff's conclusory allegation in circumstance 5 that Chief Reilly harassed plaintiff because of her gender by suggesting that she speak with the Department's counselor is insufficient to survive summary judgment. An expression of concern that plaintiff was depressed can hardly constitute harassment. And even if Chief Reilly did not like plaintiff, plaintiff has adduced no evidence that his concern was not motivated by, for instance, concern for the safety of others in the Department or a genuine concern for her. Indeed, it is telling that plaintiff does not allege that Reilly commented on his concerns publicly or in any manner "aimed to humiliate, ridicule, or intimidate" plaintiff. *Sunbelt Rentals*, 521 F.3d at 316.

To the extent racial or sexual animus can be inferred from differential treatment in *any* of the circumstances, such animus is present only in circumstances 10, 21, and 22. Plaintiff's complaint in circumstance 22 about being transferred to a fire station that she suggests was known for hostility to women and minorities is of no moment; plaintiff's only concrete complaint is that she was met with a "cold welcome" before promptly being transferred to a different station, a transfer plaintiff *wanted*. Title VII is not a "civility code for the American workplace," and "cold" treatment is far from extreme enough to qualify as harassment. *See id.* at 315. The remaining two isolated examples of differential treatment occurred roughly a year apart and neither was "extremely serious," thus likewise falling far short of clearing the high bar for a hostile work environment claim. *See Faragher*, 524 U.S. at 788. Moreover, with specific regard to circumstance 21, in which plaintiff alleges that she was treated worse than a comparable white male during her reentry training, it must be noted that the undisputed record facts clearly indicate

that (i) plaintiff was *required* to complete reentry training, (ii) the reentry training *required* successful completion of a task called "the Maze," and (iii) the Department guidelines for successful completion clearly show that plaintiff's first attempt was a failure.[31] Thus, even if plaintiff's allegation is taken as true, the circumstances surrounding plaintiff's reentry training, specifically "the Maze," indicate that plaintiff's treatment was consistent with generally applicable Department regulations and not "suggestive of illegal harassment." *See Baqir*, 434 F.3d at 747 (employer's decision to delay plaintiff's ability to perform certain medical procedures following a "questionable performance" reflects a concern for safety, not animus).

In sum, plaintiff has adduced no record evidence that any supervisor or coworker ever made an explicitly race-based comment, and plaintiff points only to a single relatively benign incident of sex-based commentary (the "break a nail" comment). And plaintiff's attempt to demonstrate race or sex based animus by way of differential treatment likewise fails because plaintiff can identify at most two relatively benign isolated incidents. As such, plaintiff cannot show harassment "because of" her race or sex and, even assuming she could do so, the incidents alleged fall far short of being sufficiently severe or pervasive so as to constitute a hostile work environment. *See Harris*, 510 U.S. at 21 (hostile work environment requires a workplace so "permeated" with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive" to alter the conditions of employment) (internal quotations omitted). Thus, plaintiff's hostile work environment claim in Count I fails.

---

[31] *See* Def't Mem. Supp. at 12-13, ¶¶ 46-48; P. Opp. at 20-21, ¶¶ 29-30 (denying defendant's ¶¶ 46-47 without citation to contradictory record evidence and not contesting defendant's ¶ 48).

## 2.

Analysis now properly turns to plaintiff's hostile work environment claim under the ADA in Count IV. To be sure, plaintiff's supervisors or colleagues spoke directly to plaintiff about her cancer, but no reasonable jury could conclude that these circumstances constitute disability-based harassment. For example, plaintiff complains in circumstance 11 that Chief Reilly asked her how she was doing and why she did not take alternative placement. Based on plaintiff's own presentation of the events, she does not suggest that Chief Reilly was mocking or humiliating her. And circumstance 24—in which Chief Barrero said "sick leave is for people who are sick"—must be considered in the context of the full record. Specifically, plaintiff's own recounting of the incident does not indicate that she was actually sick when she requested to go home on sick leave; rather, she states that she was "weigh[ed] down" by vague "constant harassment." P. Opp., Ex. D at 23. Moreover, plaintiff's own recounting of the story indicates that Chief Barrero said she could go home on sick leave if the Department's doctor determined she was actually sick. *Id.* at 23-24. In the context of all the facts, plaintiff's treatment had nothing to do with animus towards her on the basis of her disability.

Plaintiff takes particular issue with Chief Barrero's three attempts to transfer plaintiff out of FHMIS in circumstances 1, 3, and 8. Importantly, none of these interactions evidence animus because of plaintiff's disability. To the contrary, based on plaintiff's own version of events, Chief Barrero, at each of these three isolated incidents, gave plaintiff a legitimate and non-discriminatory reason for wanting to transfer her, namely because her light duty accommodation was imposing a hardship (or, in ADA parlance, an "undue hardship"[32]) on FHMIS's operations. And, of course, no transfers actually resulted from any of these incidents. Moreover, plaintiff's

---

[32] *See, e.g.,* 42 U.S.C. § 12112(b)(5)(A) (employer need not make an accommodation that "would impose an undue hardship on the operation of the business").

conclusory allegations that Chief Barrero was harassing her by requiring her to go out on calls (circumstance 3) or miss training opportunities because of staffing concerns (circumstance 8) fail to establish that her protected status was in any way the cause. And even if the cause were unlawful animus, requiring plaintiff to perform work assignments within her job duties cannot constitute a hostile work environment. Simply put, being required to perform duties consistent with the terms and conditions of one's employment cannot be an impermissible alteration of the terms and conditions of one's employment. Moreover, there is no indication that this treatment was "aimed to humiliate, ridicule, or intimidate," nor is there evidence that this was occurring with sufficient frequency to be "unrelenting." *Sunbelt Rentals,* 521 F.3d at 316. In addition, circumstance 8 must be considered alongside plaintiff's complaints about Chief Barrero. That is, plaintiff concedes that when she sought recourse from Deputy Chief Baker, he "resolved the issue [with Chief Barrero] in its entirety" and there were no "subsequent incidents of discourteous or discriminatory treatment by Barrero at FHMIS." Def't Mem. Supp. at 6-7, ¶ 26; P. Opp. at 18, ¶ 16 (not denying the quoted portions of defendant's stated fact).

The other circumstances claimed by plaintiff to support her hostile work environment are similarly unavailing. Notably, circumstance 18, concerning the alleged downgrading of plaintiff's performance evaluation, reveals that, contrary to plaintiff's representation in the EEOC charge, the basis for the downgrading was not her disability but her status as a light duty employee, in which capacity she was not able to perform the required duties of her job.[33] And other circumstances, such as circumstance 14 relating to plaintiff's removal from tactical classes, do not allow any reasonable inference of disability-based discrimination. To clarify, plaintiff was first diagnosed with cancer in February 2010, but circumstance 14 did not occur until over a year

---

[33] *See supra* n.24.

later, and there was accordingly no temporal proximity between the diagnosis and the adverse action such that a reasonable jury could infer animus on the basis of plaintiff's disability.

Plaintiff's final set of disability-centered allegations relate to her initial attempt in June 2014 to obtain an ADA accommodation. In circumstance 27, plaintiff contends that her union treated her worse than a similarly-situated white male with a similar type of cancer, but the record is devoid of any evidentiary basis by which the union's actions can be imputed to defendant. Finally, circumstance 28 details plaintiff's conflicts with Phyllis Schwartz, a human resources official, following plaintiff's request for an accommodation. Plaintiff alleges that she was harassed by Schwartz during Schwartz's attempt to obtain from plaintiff authorization to speak with plaintiff's doctor. This "harassment" is nothing more than a few in-person conversations that became heated followed by an email. There is nothing to suggest that Schwartz was in any way engaged in an attempt to humiliate or ridicule plaintiff; Schwartz was merely doing her job, which required that she interact with plaintiff to explore possible accommodations. *See Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) ("The duty to engage in [an] interactive process with a disabled employee is mandatory and requires communication and good-faith exploration of possible accommodations.").

Defendant correctly points out that because assessing a hostile work environment claim requires evaluating the totality of the circumstances, it is insufficient to look only at plaintiff's allegations when other circumstances are relevant. With respect to plaintiff's allegations of animus based on her disability, circumstances 2, 6, 20, 26, and 27 support the conclusion that plaintiff did not endure a hostile work environment. Specifically, in August 2010 plaintiff was given a light duty assignment within FHMIS *even though* defendant's view was that plaintiff was unable to perform the essential functions of her job. Moreover, the Department made an

exception to its rules in order to grant plaintiff's request for an extension of light duty beyond the one calendar year maximum. When plaintiff requested another light duty assignment in April 2012, Chief Barrero approved it, and the record does not reflect that he made any disparaging comments or otherwise express any animus in doing so. Later, after plaintiff was found to have committed misconduct for which termination would have been appropriate, Fire Chief Bowers granted plaintiff's request to have her sanction reduced to a ten-day suspension without pay. During reentry training following plaintiff's reassignment, circumstance 26 shows that plaintiff's complaints about Chief Barrero resulted in her being transferred to a fire station where another chief had specifically requested her. Finally, in June 2014 when plaintiff requested a "day work" assignment in place of her 24-hour shift schedules in the Operations Bureau, the request was promptly granted *even though* plaintiff had a Class A medical status and was considered fully operational. In short, the record reflects that defendant has accommodated plaintiff's requests even when, in defendant's view, it had no legal obligation to do so. When plaintiff's allegations, which suggest only the ordinary office conflicts many workers experience daily, are viewed in light of the many circumstances in which plaintiff was afforded positive treatment, it is clear that plaintiff's work environment was not rife with animus, and certainly not severe or pervasive. *See Harris*, 510 U.S. at 21 (hostile work environment requires a workplace so "permeated" with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive" to alter the conditions of employment) (internal quotations omitted).

In sum, plaintiff's disability hostile work environment claim in Count IV centers chiefly on her conflicts with Chief Barrero. Yet, plaintiff has no evidence of specific actions or statements indicating hostility by Chief Barrero, or anyone, towards disabled persons generally or cancer patients specifically. Plaintiff's attempt to impute animus based on reprimands

(circumstance 23) or undesirable work assignments (circumstances 3 and 8) relies on speculation and conjecture. Moreover, plaintiff's conclusory statements about "constant harassment" lack the requisite specificity at which to engage in meaningful analysis. *See Causey*, 162 F.3d at 801 (disregarding "conclusory" allegations in answers to interrogatories and limiting the analysis to the "sufficiently detailed" accusations). When review is limited only to specific and concrete allegations, it is clear that plaintiff may have had numerous unpleasant run-ins with Chief Barrero over several years, but these incidents of rudeness and conflicts reflect neither impermissible animus nor are they sufficiently severe or pervasive to establish a hostile work environment that was directed at humiliation, ridicule, or intimidation.

### 3.

Plaintiff's retaliatory hostile work environment claims in Counts II and V also fail. As the Supreme Court made clear in *Nassar*, retaliation claims require "but for" causation. Put differently, *Nassar* requires plaintiffs to prove that the adverse action would not have occurred in the absence of the retaliatory animus. *See* 133 S. Ct. at 2525. Here, plaintiff's causation theory is clearly lacking. Prior to plaintiff's August 2012 written complaint to Deputy Chief Baker, the record does not reflect when any other potentially protected verbal complaints were made or which of plaintiff's alleged harassers, if any, knew of such complaints. Accordingly, plaintiff cannot show that any harassment occurring before August 2012 was caused by protected activity. Moreover, plaintiff has conceded that her August 2012 complaint to Deputy Chief Baker led to no "subsequent incidents of discourteous or discriminatory treatment by Barrero at FHMIS." Def't Mem. Supp. at 6-7, ¶ 26; P. Opp. at 18, ¶ 16 (not denying the quoted portions of defendant's stated fact). And even assuming for purposes of summary judgment that plaintiff's written complaint to Deputy Chief Baker was protected activity, there is no evidence that any of

the other supervisors between August 2012 and plaintiff's transfer to the Operations Bureau knew of this activity.

In January 2014, plaintiff was returned to the supervision of Chief Barrero and thereafter filed an EEOC charge of discrimination, but there is no evidence that Chief Barrero knew of plaintiff's new protected activity, nor is there any temporal proximity between plaintiff's protected August 2012 activity and any negative treatment in January 2014. Moreover, it is undisputed that by February 2014 plaintiff was transferred from Chief Barrero's supervision after she requested such a transfer. Plaintiff's only other allegation of retaliation is her claim that defendant has failed to provide her a reasonable accommodation under the ADA, but that discrete alleged failure, which is not properly presented in this case, does not constitute a severe or pervasive working condition cognizable as a hostile work environment claim. Indeed, circumstance 27 shows that plaintiff was given what she requested. Accordingly, there is no basis from which a reasonable jury could conclude that plaintiff's protected activity was the "but for" cause of any alleged harassment. Thus, plaintiff's hostile work environment claims in Counts II and V must fail.

### 4.

As a global observation about plaintiff's hostile work environment claims across all counts, it should be noted that although there is recent authority in the Fourth Circuit suggesting a more relaxed "severe or pervasive" test, there is no reason to believe that this authority has much bearing here. In *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir.) (*en banc*), the Fourth Circuit concluded that two uses of a highly charged racial epithet were sufficient to create a jury question on severity. But the logic of *Boyer-Liberto* rested on the acknowledgment that there are certain words with such a deep history of animus that these words

have no place in any work environment. *See id.* The use of such words in the workplace,

therefore, is clearly "out of the ordinary." *Sunbelt Rentals*, 521 F.3d at 315. Here, no single

discrete act or set of discrete acts both (i) evidences animus sufficient to satisfy the causation

requirement and (ii) draws on deep social or historical undercurrents of disdain with the same

force as the epithet in *Boyer-Liberto*. To the contrary, plaintiff's complaints of rudeness,

callousness, insensitivity, unfairness, anger, or spite center in large part on the routine and

ordinary aspects of office life such as cold treatment by coworkers (circumstances 4 and 22) or

frustrating equipment policies (circumstances 17 and 25). Apart from one incident of relatively

benign offensive language (the "break a nail" comment in circumstance 5), the record contains

no evidence from which any reasonable jury could infer an intent to intimidate or humiliate, and

the acts described with any specificity do not rise to the severe or pervasive standard *Harris*

requires. In short, while plaintiff has produced a number of incidents claimed to constitute a

hostile work environment, they are not severe or pervasive in the sense required by law. *See*

*Harris*, 510 U.S. at 21 (hostile work environment requires a workplace so "permeated" with

"discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive" to

alter the conditions of employment) (internal quotations omitted).

    One circumstance that merits mention is circumstance 15, in which plaintiff allegedly

found a substance resembling marijuana in her work vehicle. No doubt, such an occurrence is out

of the ordinary, but it is not *so* out of the ordinary on this record to survive summary judgment.

A similar incident did survive summary judgment in *Hoyle v. Freightliner, LLC*, 650 F.3d at 321

(4th Cir. 2011), but *Hoyle* is easily distinguished from the record here. In *Hoyle*, a female

plaintiff found that a tampon had been affixed to a key ring for a truck in plaintiff's work area.

*Id.* at 326. Later, another employee overheard a group of male coworkers laughing about the

incident, which suggested culpability for the prank. *See id.* Importantly, the Fourth Circuit noted that (i) a tampon "has strong sex-specific connotations" and (ii) the truck in which the tampon was placed would be used either by the plaintiff or another female employee. *See id.* at 332. Moreover, this incident occurred in a work environment that had been "sexualiz[ed]...by placing photos of nude women or women in sexually provocative dress and poses in common areas." *Id.* at 331-32. Here, the work environment was not otherwise rife with racial, sexual, or disability animus, and there is no evidence to suggest that anyone was playing a cruel joke on plaintiff specifically. And, unlike in *Hoyle*, plaintiff has no evidence to suggest who the perpetrator(s) might be. Moreover, a bag of a substance resembling marijuana does not have strong connotations specific to race, sex, or disability. Thus, even if the incident here was a joke at plaintiff's expense—of which there is no evidence, unlike in *Hoyle*—there is no basis on which to conclude that it was a joke at the expense of a protected trait or activity. And finally, whereas the truck in *Hoyle* was set to be used by one of two female employees, plaintiff's own recounting of the incident here acknowledges that other investigators "constantly" used her vehicle, which counsels against any inference that the substance was placed intentionally in order to target plaintiff (as opposed to targeting another employee or merely being left behind on accident). P. Opp., Ex. D at 17.

In conclusion, the undisputed record evidence does not disclose treatment that was so severe or pervasive as to constitute a hostile work environment with respect to any protected characteristic or activity. Indeed, the undisputed record facts show that plaintiff's complaints were often addressed and her requests were often granted.[34] Additionally, the record reflects that the alleged harassment never rose to the level of physical touching or intentional humiliation.

---

[34] *E.g.*, circumstances 1, 2, 6, 7, 9, 20, 26, and 27.

Even assuming, *arguendo*, that the allegations rose to such a level as to meet the "severe or pervasive" test's high bar, there is no evidence from which a reasonable jury could conclude that the harassment was motivated by an unlawful discriminatory or retaliatory animus. As the Fourth Circuit has made clear, "causation must be shown by probability rather than mere possibility." *Autry v. N.C. Dep't of Human Res.*, 820 F.2d 1384, 1386 (4th Cir. 1987). It is simply not enough to show that plaintiff is an African-American female with a disability who was subject to harassment; there must be "some independent evidence of…animosity" towards a protected characteristic or activity, which is not present here. *See Gilliam*, 474 F.3d at 143. Accordingly, plaintiff's hostile work environment claims cannot succeed. And, as these were the only remaining claims in Counts I, II, IV, and V, defendant is entitled to summary judgment in full on these counts.

## IX.

Finally, plaintiff alleges in Count III that defendant is liable under 42 U.S.C. § 1983 for violating plaintiff's First and Fourteenth Amendment rights.[35] Specifically, plaintiff alleges unlawful discrimination on the basis of her race and gender.

A municipality is only liable under § 1983 if the municipality deprives a plaintiff of federal rights (i) through an official written policy, (ii) through the affirmative decisions of individual policymaking officials, (iii) through the omissions of policymaking officials that

---

[35] The basis for plaintiff's First Amendment claim is unclear from the face of the Amended Complaint, which alleges First Amendment liability but thereafter focuses only on alleged violations of the Equal Protection Clause. Moreover, plaintiff offered no argument on either the First or Fourteenth Amendment claims in her opposition to summary judgment. This is sufficient for defendant to prevail as unopposed on the motion as to Count III. *See Hobratschk v. Spahr*, 154 F. App'x 400, 400 (4th Cir. 2005) (holding that it was not error for the district court to enter summary judgment against plaintiff who did not oppose part of defendants' motion for summary judgment). In any event, the merits of plaintiff's claim are addressed for completeness.

manifest deliberate indifference to the rights of citizens, or (iv) through a "persistent and widespread" custom that is so well settled that it has the force of law. *See Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). Significantly, § 1983 does not provide for municipal liability on a theory of *respondeat superior. Id.* Here, plaintiff asserts three theories of municipal liability: (i) that defendant acted through the policymaking officials of the Fairfax County Fire Department; (ii) that there is custom of intimidation and discrimination; and (iii) that defendant failed to train employees about the relevant rights.

Plaintiff's first theory fails because a municipality can only be liable for the acts of those officials who have final policymaking authority for the municipality itself. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). That is, plaintiff cannot prevail simply because someone with policymaking authority undertook a discriminatory action as that would constitute *respondeat superior* liability. Instead, a municipality is liable only for the affirmative decisions of "final policymakers" for the municipality. If the Department's policymakers' decisions are subject to review by the municipality, then the fire department policymakers do not have "final policymaking authority." *See id.* at 127 ("[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies."). Whether an entity or official has "final policymaking authority" is a question of state law. *Id.* at 123. And it is clear that under Virginia law the final policymaking body for Fairfax County is the Fairfax County Board of Supervisors. *See* Va. Code § 15.2-403 ("The board shall be the policy-determining body of the county."). Plaintiff points to no evidence that this final policymaking authority has been delegated to the policymaking officials in the Department such that the Department officials' decisions are not

subject to review. Accordingly, municipal liability is inappropriate here based on the actions of the Department officials.

Plaintiff's second theory fails because in order to show the existence of a "custom" that imputes liability to a municipality, plaintiff must show that "the duration and frequency of the practices warrant a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987). Here, plaintiff points to no evidence of "recorded reports to or discussion by a municipal governing body." *Id.* (describing how to prove "actual knowledge"). Moreover, plaintiff identifies no evidence that the practices are "so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." *Id.* (describing how to prove "constructive knowledge"). In fact, the undisputed record evidence shows that in the past five years, plaintiff is the only female African-American employee to complain of discrimination to defendant's Office of Human Rights and Equity Programs ("OHREP") or to the Department's internal Equal Opportunity Office. Moreover, over the last five years the Department has received a total of fourteen discrimination complaints, of which (i) two were withdrawn, (ii) one was resolved via mediation, and (iii) eleven were investigated and determined to be unfounded. And of the seven complaints to OHREP in the past five years (other than plaintiff's), only one was substantiated, resulting in prompt remedial action. Thus, plaintiff cannot show a custom of discrimination of which defendant was actually or should have been aware.

Finally, plaintiff's third theory—failure to train—fails for similar reasons. To establish municipal liability for failure to train, plaintiff must show that defendant acted with "deliberate indifference" to the rights at issue. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This, in

turn, requires proof of actual or constructive notice of the need for different training. *See Connick v. Thompson*, 563 U.S. 51, 59 (2011). As above, plaintiff adduces no evidence to show actual or constructive notice of constitutional violations requiring different training such that defendant can be held liable for any failure to train.

Even setting aside the foregoing rationales, for the reasons stated in Parts IV through VIII, *supra*, plaintiff has not adduced any evidence from which a reasonable jury could conclude that "a predicate constitutional violation," namely race or sex discrimination, occurred within the two year statutory period preceding the filing of this action. Such a deprivation is a necessary predicate to municipal liability. *See Baker v. D.C.*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). This is so even when the theory is failure to train. *See Harris*, 489 U.S. at 392. The failure to produce record evidence sufficient to establish the deprivation of a federal right is dispositive. Yet, even assuming that discrimination occurred within the statutory period, plaintiff has not produced evidence sufficient to support the imposition of municipal liability under § 1983. And, in any event, it is sufficient for defendant to prevail on Count III that plaintiff failed to oppose defendant's motion with respect to this count, as noted *supra* n.35. Thus, defendant is entitled to summary judgment on Count III.

## X.

For the foregoing reasons, the undisputed record reflects that defendant is entitled to summary judgment on all counts.

An appropriate order will issue.

Alexandria, Virginia
January 13, 2016

T. S. Ellis, III
United States District Judge